GRAY CONSTRUCTION CO., Respondent, v. FANTLE, et al, Appellants.

(253 N. W. 464.)

(File No. 7189. Opinion filed February 23, 1934.)

For former opinion, see Gray Construction Company v. Hyde, 60 S. D. 265, 244 N. W. 320.

*Bailey & Voorhees* and *Judge & Chapman,* all of Sioux Falls, for Appellants.

*Case & Case,* of Watertown, and *Bruell & Henderson,* of Redfield, for Respondent.

CAMPBELL, J.  The present litigation has been carried on in the courts of this state for about sixteen years.  It has been twice ruled upon by the circuit court; three opinions have been written by this court, and two rehearings have been granted by this court, upon the second of which the case has been reargued and is now for our decision.  Before writing further concerning it, we may profitably (in the words of Daniel Webster) refer to the point whence we departed, in the hope of being able to conjecture where we now are.

In the year 1901 a small group of men in Sioux Falls became interested in the project of a railroad to run northwesterly from Sioux Falls. In the fall of 1903 the South Dakota Central Railroad Company was incorporated. The par value of the capital stock was $100 per share. The manner of its issuance we will discuss later. For the present it is enough to say that it is stipulated in this case that the corporation, as a matter of fact, never received value in excess of $25 per share for any of its capital stock, although all the stock was issued as fully paid.

Actual construction of the railroad was commenced in the spring of 1904 and a line was subsequently built and started in operation running from Sioux Falls to Watertown. In January, 1907, the company, in order to raise money for its needs, put out a $1,000,000 bond issue; the bonds being secured by mortgage or deed of trust on all the property, real, personal or mixed, which the company then had or might thereafter acquire. The company was unable successfully to continue its operations for any very considerable period of time and presently, and in January, 1916, the trust deed was foreclosed for the benefit of bondholders and all the property of the railroad company was sold thereunder leaving the corporation insolvent, with no assets or property, and a considerable amount of liabilities. Thereupon one Shugart, a creditor of the railroad company, started an action in the district court of Jasper county, Iowa, against F. L. Maytag and other stockholders of the railroad company seeking to enforce his claim against them on the ground that the stock held by them had not been fully paid for. Shortly thereafter the present action was started in the circuit court of Codington county, S. D., by Gray Construction Company, also one of the creditors of the railroad company, as plaintiff, against A. W. Hyde and others as stockholders of the railroad company; the basis of the action being that the plaintiff was a creditor of the insolvent corporation and that the defendants were the owners of stock therein of the par value of $100 per share for which the corporation had never received more than $25 per share. At about the same time five other actions were started in the Codington county circuit court against the same defendants upon the same theory. The six cases mentioned were tried in the circuit court and appealed to this court upon the same record although by separate appeals, and the decision in this case must

control all six. Other similar actions were likewise instituted by other creditors wherein stipulations were made that they should be controlled by the decision herein. Although the claim of the present plaintiff (in behalf of itself and its assignors) amounts only to about $6,000 with interest from March, 1917, nevertheless, by reason of the other actions instituted and stipulations made as aforesaid, the decision in this case in point of fact determines the liability of defendants in an amount approximating in the aggregate some $30,000 plus interest thereon for sixteen years or more.

The cause was not brought on for trial in the circuit court in the first instance until after the Shugart Case had been tried in the district court of Jasper county, Iowa, appealed to the Supreme Court of that state, and there affirmed. Shugart v. Maytag et al [March 23, 1920] 188 Iowa, 916, 176 N. W. 886. The present case thereafter coming on for trial, the findings, conclusions, and judgment of the circuit court were adverse to the defendants A. W. Hyde (who has since died, his executrix, Anna R. Hyde, being substituted as party defendant), W. L. Baker, Sam Fantle, and Charles Fantle (who also has since died, his executrix, Lillian Fantle, being substituted as party defendant). From such adverse judgment and from the denial of their application for new trial the defendants last above named appealed to this court and the judgment was here affirmed. Gray Construction Co. v. Hyde, 49 S. D. 543, 207 N. W. 536. Thereafter a rehearing was granted by this court and the former opinion was modified and the cause remanded to the circuit court for further proceedings, particularly with reference to ascertaining whether or not the defendants and appellants had acquired their stock in the insolvent corporation with notice of the fact that although said stock purported to be fully paid and of the par value of $100, nevertheless the corporation had not received to exceed $25 per share upon the issuance thereof. Gray Construction Co. v. Hyde, 54 S. D. 122, 222 N. W. 675. Further testimony was taken in the circuit court, supplemental findings were made, and a second judgment in favor of the plaintiff and against the same defendants as before was again entered in the circuit court, from which judgment and a denial of their application for new trial the defendants again appealed to this court. This court affirmed the judgment as to W. L. Baker, Charles Fantle, and Sam Fantle, modifying it in some respects as

to defendant and appellant Anna R. Hyde, as executrix of A. W. Hyde. Gray Construction Co. v. Hyde, 60 S. D. 265, 244 N. W. 320. Thereafter defendants and appellants W. L. Baker, Samuel Fantle and Lillian Fantle, as executrix of Charles Fantle, petitioned separately to this court for rehearing. The petition of W. L. Baker was denied, but the petition of the Fantles was granted, and as to the Fantles only the matter is again before us. It will be much simpler and more convenient to speak of the two Fantles throughout this opinion and to discuss the matter without making constant reference to the facts that Charles Fantle has died since this action was started and that his executrix has been substituted as party defendant and appellant herein. We shall accordingly so do.

Charles and Sam Fantle were brothers engaged in the business of conducting a department store in Sioux Falls, having been engaged in such business since about the year 1895. Neither of them was among those who organized the South Dakota Central Railroad in 1903. At the time of the insolvency of the South Dakota Central Railroad, Charles Fantle was the owner of 100 shares of the capital stock of that corporation and Sam Fantle was the owner of 335 shares thereof, the facts concerning which will be more fully hereinafter discussed. Concededly the corporation itself never received in excess of $25 per $100 share for any of said stock. The sole question now for our consideration is the liability of the Fantles as stockholders, the insolvency of the corporation, and the validity of respondent's claim as a creditor thereof being conceded.

Section 8779, Rev. Code 1919, reads as follows: "Each stockholder of a corporation is individually and personally liable for the debts of the corporation to the extent of the amount that is unpaid upon the stock held by him. Any creditor of the corporation may institute joint or several actions against any of its stockholders that have not fully paid the capital stock held by him, and in such action the court must ascertain the amount that is unpaid upon the stock held by each stockholder and for which he is liable, and a several judgment must be rendered against each in conformity therewith. The liability of each stockholder is determined by the amount unpaid upon the stock or shares owned by him at the time such action is commenced, and such liability is not released by any subsequent transfer of stock. And in no other case

shall the stockholders be individually and personally liable for the debts of the corporation. The term 'stockholder,' as used in this section, shall apply not only to such persons as appear by the books of the corporation to be such, but also to every equitable owner of stock, although the same appear upon the books in the name of another; and also to every person who has advanced the installments or purchase money of stock in the name of a minor, so long as the latter remains a minor; and also to every guardian or other trustee who voluntarily invests any trust funds in the stock. Trust funds in the hands of a guardian or trustee shall not be liable under the provision of this section by reason of any such investment, nor shall the person for whose benefit the investment is made be responsible in respect to the stock until he becomes competent and able to control the same; but the responsibility of the guardian or trustee making the investment shall continue until that period. Stock held as collateral security, or by a trustee, or in any other representative capacity, does not make the holder thereof a stockholder within the meaning of this section, except in the cases above mentioned, so as to charge him with the debts or liabilities of the corporation, but the pledgor, or person or estate represented, is to be deemed the stockholder as respects such liability."

The present action was predicated originally on the theory that by virtue of this statute it was only necessary to allege and prove that plaintiff was a creditor of the corporation; that defendants were stockholders therein or appeared by the books of the corporation to be stockholders; and that the corporation, in point of fact, had not received full par value in return for the stock presently held by the defendants. That, in substance, was the interpretation placed upon our statute by the Iowa court in the Shugart Case, supra, 188 Iowa 916, 176 N. W. 886, 890, which opinion was filed about two months prior to the original trial of the present cause in the Codington county circuit court. That view of the statute was apparently accepted by the circuit court on the original trial and by this court in its first opinion. 49 S. D. 543, 207 N. W. 536. We believe that such an interpretation of our statute is erroneous and entirely overlooks the nature and origin of the statute, and after further consideration of the matter on rehearing, this court in its second opinion (54 S. D. 122, 222 N. W. 675) receded there-

from. In this connection it may be of interest to note that in a recent decision (State ex rel v. Associated Packing Co. [1933] 249 N. W. 761) the Supreme Court of Iowa appears quite definitely to have departed from some of the views previously announced by it concerning the matter of stockholder's liability for unpaid subscriptions. Cf. State ex rel v. Associated Packing Co. (1928) 206 Iowa 405, 220 N. W. 6.

█ Some confusion has arisen from the fact that the phrase "stockholder's liability" is employed in the cases from time to time to mean three entirely separate and distinct things.

The phrase is frequently employed to denote what is sometimes more definitively called statutory, or added, or double, stockholder's liability, that is, a liability (whether complete, limited or proportional) of the stockholder qua stockholder, and notwithstanding that he has made full and complete payment upon his stock, for the debts of the corporation. An example of this first type of stockholder's liability in the case of banking corporations is found in section 3 of article 18 of our Constitution, providing that stockholders of such corporations shall be individually liable for all debts of the corporation "to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares or stock," etc. This type of stockholder's liability whenever it exists is imposed by some specific constitutional or statutory provision. At the common law no stockholder whose stock was fully paid for was ever personally liable, merely because he was a stockholder, for the debts of the corporation either at law or in equity. The corporation was regarded as a legal entity distinct from the stockholders in their individual capacity, and the debt of the corporation was the debt of such legal entity and not of the individual stockholders. This was one of the principal features which distinguished a corporation from a partnership, and such privilege of limited liability has been well called "the corporation's most precious characteristic." 19 Mich. Law Rev. 583.

The second type of case with reference to which the phrase "stockholder's liability" is often employed is the case where the stockholder, promising and agreeing to pay the full par value of his stock, has obtained the stock certificate prior to complete payment. In other words, it is a case where the agreed subscription price of the stock is wholly or partially unpaid.

■ The third type of case with reference to which the phrase "stockholder's liability" is frequently used is the case commonly referred to by the textwriters as that of "bonus or watered or fictitiously paid up stock." Here there is no outstanding unperformed promise to pay. The stock is deliberately and intentionally issued by the corporation as fully paid-up stock, although in fact it is only partially paid for, if at all, and all or part of the purported consideration for its issuance is entirely fictitious. It is this third type of situation that is involved in the present case. It is admitted that South Dakota Central Railroad Company received for all its stock all that it ever expected to receive. There are no outstanding unperformed subscription promises. There is a distinction not to be overlooked between the liability of stockholders who still owe something upon their subscription contract, and the liability of the holders of stock which was intentionally but falsely and fictitiously issued as fully paid up. "The rights of creditors as to stock issued as full paid upon payment of less than par value, whether in cash, property, services, or what not, is fully considered in another subdivision of this chapter. It is important to keep in mind essential differences between action by a creditor to recover upon unpaid subscriptions and action by a creditor to recover from stockholders who have received bonus or watered stock, in that the cause of action in the one case rests on contract while the cause of action in the other case rests in tort. If stock is issued for cash as paid up, under an agreement that payment in full shall not be required, there is a fraud upon creditors, who may enforce payment in full." Fletcher Cyclopedia Corporations (Perm. Ed.) § 6048.

■ Stockholder's liability of the second type and of the third type is particularly distinguishable from stockholder's liability of the first type (the so-called statutory, added or double liability); in that the second and third types of liability are based upon fundamental legal and equitable principles, have always been known to the law, and exist independently of and without the necessity for any statutory or constitutional enactment.

■ The state of California is one of a very few states which for many years (and, in fact, until repealed by the adoption at the November, 1930, general election of an amendment proposed by chapter 64, Statutes and Amendments California 1929, p. 2239)

had a specific constitutional provision affirmatively rendering stockholders of corporations individually and personally liable for such proportion of the corporate debts as the stock held by each bore to the total stock issued, regardless of the fact that the stock had been fully paid for. See Constitution California 1849, art. 4, § 36; Constitution California 1879, art. 12, § 3. Pursuant to this constitutional requirement, section 322, California Civil Code 1872 as amended (Code Amendments 1873-74, § 70, p. 203), established such added and proportional liability by the following language: "Each stockholder of a corporation is individually and personally liable for such proportion of its debts and liabilities as the amount of stock or shares owned by him bears to the whole of the subscribed capital stock or shares of the corporation, and for a like proportion only of each debt or claim against the corporation. Any creditor of the corporation may institute joint or several actions against any of its stockholders, for the proportion of his claim payable by each, and in such action the Court must ascertain the proportion of the claim or debt for which each defendant is liable, and a several judgment must be rendered against each in conformity therewith. If any stockholder pays his proportion of any debt due from the corporation, incurred while he was such stockholder, he is relieved from any further personal liability for such debt; and if an action has been brought against him upon such debt, it shall be dismissed as to him, upon his paying the costs, or such proportion thereof as may be properly chargeable against him. The liability of each stockholder is determined by the amount of stock or shares owned by him at the time the debt or liability was incurred; and such liability is not released by any subsequent transfer of stock. The term 'stockholder,' as used in this section, shall apply not only to such persons as appear by the books of the corporation to be such, but also to every equitable owner of stock, although the same appear on the books in the name of another; and also to every person who has advanced the installments or purchase money of stock in the name of a minor, so long as the latter remains a minor; and also to every guardian or other trustee who voluntarily invests any trust funds in the stock. Trust funds in the hands of a guardian or trustee shall not be liable under the provisions of this section by reason of any such investment, nor shall the person for whose benefit the investment

is made be responsible in respect to the stock until he becomes competent and able to control the same; but the responsibility of the guardian or trustee making the investment shall continue until that period. Stock held as collateral security, or by a trustee, or in any other representative capacity, does not make the holder thereof a stockholder within the meaning of this section, except in the cases above mentioned, so as to charge him with any proportion of the debt or liabilities of the corporation; but the pledgor, or person, or estate represented, is to be deemed the stockholder as respects such liability. In corporations having no capital stock, each member is individually and personally liable for his proportion of its debts and liabilities, and similar actions may be brought against him, either alone or jointly with other members, to enforce such liability as by this section may be brought against one or more stockholders, and similar judgments may be rendered."

The Revised Civil Code of Dakota of 1877 was based in large part upon the California Civil Code of 1872 as amended in 1873-74, and when our Civil Code of 1877 was enacted there was included therein, as section 413 thereof (whether inadvertently or not we can only conjecture), the exact language of section 322, California Civil Code, as above quoted, save only that there was omitted the last clause thereof commencing with the words "In corporations having no capital stock, each member is individually and personally liable," etc. Thereby there was imported into the statute law of Dakota Territory (without any necessity therefor by reason of constitutional requirement) the rule of stockholder's personal liability for corporate debts even though his stock was fully paid for, which existed in the California statute because the California Constitution affirmatively demanded it. The next session of the South Dakota Territorial Legislature (chapter 9, Laws Dak. 1879) amended section 413, Dakota Civil Code 1877, to the exact form which has since persisted unchanged in our law and has now become sections 8779, Rev. Code 1919, hereinbefore quoted. It is very apparent that when section 8779, Rev. Code 1919, originated as chapter 9, Laws Dakota 1879, it was not the purpose or intention to change in any way the rule of law with reference to stockholder's liability of the second and third types hereinbefore discussed, that is, for unpaid subscriptions, or in the case of watered stock or stock fictitiously and fraudulently issued as being fully paid.

The object was to abrogate the rule creating liability of the first type, i.e., the added personal liability of stockholders who had fully paid for their stock, which rule had been permitted to come into our law (possibly unintentionally) by enacting as section 413, Dakota Civil Code 1877, the words of section 322, California Civil Code. As to stockholder's liability of the second and third types (conceding that the statute is applicable at all to cases of the third type as distinguished from cases of the second type), we are satisfied that section 8779 (so far as concerns the existence of such liability) is merely declaratory of the common law. The first case in this court relating to the statute held that the intention of the 1879 amendment "was to limit the personal statutory liability of stockholders for the debts of the corporation to the amount due, if any, upon the stock owned by them at the time suit is instituted to enforce collection thereof." Busby v. Riley (1894) 6 S. D. 401, 61 N. W. 164, 165. The Supreme Court of Minnesota has twice announced that our statute was merely declaratory of the common law. First, etc., Bank v. Gustin, etc., Co. (1890) 42 Minn. 327, 44 N. W: 198, 6 L. R. A. 676, 18 Am. St. Rep. 510; Northwest Paper Co. v. Neill (1926) 168 Minn. 406, 210 N. W. 148. The statute does not purport to change the nature of the stockholder's liability or create a liability where one would not have existed at the common law or change the burden of proof, but, in substance, simply makes the common-law stockholder's liability (at least of the second type and possibly of the third type) directly available to the corporation creditor rather than treating such liability as an asset of the corporation. In re Associated Oil Co. (C. C. A. 6th Circuit 1923) 289 F. 693. "In most of the states a constitutional or statutory provision declares that stockholders shall be individually liable to creditors of the corporation to the amount due on their stock. Such a provision ordinarily imposes no greater liability than exists in the absence of any provision on the subject, and is merely declaratory of the common law. The constitutionality of such statutes has been upheld. Such statutes sometimes also fix part or all of the following: (1) the remedy, (2) who may sue, (3) conditions precedent, and (4) persons liable; and in such respects they may, in particular cases, change the law as it existed independently of statute." Fletcher Cyclopedia Corporations (Perm. Ed.) § 6053. See, also, Patterson v. Lynde (1882)

106 U. S. 519, 1 S. Ct. 432, 27 L. Ed. 265; Stoddard v. Lum (1899) 159 N. Y. 265, 53 N. E. 1108, 45 L. R. A. 551, 70 Am. St. Rep. 541; Burch v. Taylor (1890) 1 Wash. 245, 24 P. 438; City of Montesano v. Carr (1914) 80 Wash. 384, 141 P. 894, 7 A. L. R. 95; Amick v. Elliott (1928) 222 Ky. 753, 2 S. W. (2d) 367; Crawford v. Swicord (1918) 147 Ga. 548, 94 S. E. 1025.

██ ██ As hereinbefore suggested, it might very plausibly be urged that a statute such as section 8779 had no application in any event to an action to recover in the case of watered or fictitiously issued stock as distinguished from an unpaid stock subscription. We have previously mentioned the distinction between the two proceedings. The case of unpaid subscription rests in contract. The case of watered or fictitiously issued stock rests in tort. The distinctions are well pointed out in Spencer v. Anderson (1924) 193 Cal. 1, 222 P. 355, 35 A. L. R. 822. However, since our statute, as we have seen, is merely declaratory of the common law as to the existence of liability, it is not very material whether or not it be deemed to include the case of stockholder's liability of the third type; that is, the case of watered or fictitiously issued stock. It is the clear rule that in such case the liability for the fraud can rest only upon the person who committed it or those who had notice thereof or participated therein. "An innocent purchaser for value of stock issued as paid-up stock for property or services at an overvaluation is not liable to an assessment as upon an unpaid subscription, to pay debts of the corporation." Annotation, 12 A. L. R. 449, at page 451, and cases cited. "Whether there is any liability on the part of the transferee depends upon whether he was a bona fide purchaser. If he purchased with notice, actual or constructive, that the stock was not in fact fully paid up, he is subject to the same liability as his transferor; but he is not liable at all if he purchased without such notice, since fraud is the basis of the liability of the stockholder, and if he had no notice, he cannot be guilty of fraud. But it is sufficient to impose liability upon the transferee to show that, when he accepted his stock, he had notice or knowledge of its real character; 'such guilty knowledge is essential to bind the purchaser of watered stock to respond to an equitable call in behalf of the creditors of the corporation'; this is practically the universal rule of the decisions, and the burden of proof rests on the creditor to show that the stockholder

was not a holder in good faith and without notice." Fletcher, Cyclopedia Corporations (Perm. Ed.) § 5242. "Stockholders who are not subscribers to the stock of a corporation are held to assume the unpaid portion of the subscription price when it appears they have accepted stock ostensibly fully paid, but in reality issued as such in exchange for property at a gross overvaluation, with knowledge of the transaction through which the watered stock was issued. Such guilty knowledge is essential to bind the purchaser of watered stock to respond to an equitable call in behalf of the creditors of the corporation. The burden of alleging and proving notice of the taint in the original transaction is cast upon the party who would advantage himself of the responsibility resulting from the fraud." Andrews v. Panama Oil Co. (1920) 50 Cal. App. 764, 195 P. 963, 964. To the same effect, see California Nat. Supply Co. v. Dinsmore (1921) 52 Cal. App. 513, 199 P. 552.

■ The liability involved in the instant case being in the nature of a tort liability for fraud, it may well be doubted whether the Legislature could constitutionally impose liability upon the innocent transferee of corporate stock for fraud of his predecessor in title in which he did not participate and of which he did not have notice when the transfer was made. In any event, however, our statute evidences no such intention. For the corporation creditor to recover against the Fantles in the present case (it being conceded that the case is one of watered or fictitiously issued stock and that the corporation wrongfully and intentionally issued the stock as fully paid-up stock although it had only received 25 cents on the dollar therefor), it has the burden of establishing, either that the Fantles purchased or subscribed for such stock from the corporation themselves, thereby participating in the fraud, or that whenever and however they acquired the stock, they acquired it with notice, actual or constructive, that such fraud inhered therein.

■ We come then to the question of whether plaintiff in this case has sustained such burden of proof. At the original trial, as we have previously stated, it was the theory of plaintiff and of the trial court, in accordance with the ruling of the Iowa court in Shugart v. Maytag, that it was sufficient merely to show that the Fantles were stockholders and that the corporation had not received full payment with reference to the stock presently held by the Fantles notwithstanding it had been issued as fully paid up.

At the time of the original trial the only finding concerning the Fantles and their liability was finding No. 9, reading as follows: "That the defendant Sam Fantle was and is the owner of 335 shares of stock of the said South Dakota Central Railway Company, upon which there remains unpaid and owing by said Sam Fantle the sum of $25,125.00; that the defendant Charles Fantle was and is the owner of 100 shares of stock of the said South Dakota Central Railway Company, upon which there remains unpaid and owing by the said Charles Fantle the sum of $7,500.00." After the opinion of this court on the rehearing (54 S. D. 122, 222 N. W. 675) further testimony was taken, and the trial court made the following "blanket" supplementary finding with reference to all the defendants: "The Court finds that the Findings of Fact heretofore duly filed and entered were sustained by the evidence and further finds that the said defendants, W. L. Baker, Charles Fantle, Sam Fantle, and A. W. Hyde, did not purchase their said stock in the open market, but purchased their respective shares of stock, and the stock so held by them, respectively, as set forth in the Findings of Fact hereinbefore filed and entered, and with knowledge and under circumstances and conditions affirming knowledge in them, and each of them, of the fact that such shares of stock were not fully paid for to the South Dakota Central Railway Co., and that said Railway Company had not been paid nor received therefor, at the time of the sale or delivery thereof, or at all, in money or value, in excess of Twenty-five Dollars ($25.00), per share."

The precise question now for our determination on this rehearing is whether or not the evidence is sufficient, so far as the Fantles are concerned, to support the finding that they purchased their stock "with knowledge and under circumstances and conditions affirming knowledge in them and each of them of the fact that such shares of stock were not fully paid for to the South Dakota Central Railway Company." In the most recent opinion in the cause (Gray Const. Co. v. Hyde, 60 S. D. 265, 244 N. W. 320) we did not attempt to set out the evidence in detail. Upon the rehearing the Fantles urge that the magnitude and importance of the matter, so far as their interests are concerned, justify their request for a further examination thereof, and they most earnestly insist that the evidence is entirely insufficient to show that they

purchased or subscribed for any stock from the corporation itself at any time, or that they acquired any of their stock with knowledge or notice that the same had not been fully paid for or under such circumstances as to put them upon inquiry in that regard.

At the original trial of this action plaintiff introduced the testimony of F. L. Maytag, one of the original incorporators, who became president of the corporation in 1910. Maytag claimed no personal knowledge as to any transactions of the Fantles or either of them, but identified certain stock certificate stubs which he said were turned over to him when he became president as purporting to be original records of the corporation showing stock issue. These stubs indicated that certificate No. 289 for 100 shares of stock had been issued to Charles Fantle on April 25, 1908. These stubs also showed the issuance of six stock certificates to Sam Fantle as follows: No. 159, 5 shares, September 25, 1907; No. 229, 10 shares, March 10, 1908; No. 290, 100 shares, April 25, 1908; No. 298, 10 shares, May 7, 1908; No. 419, 110 shares, March 31, 1910; No. 500, 100 shares, March 18, 1911. It was subsequently agreed that at the time of the insolvency of the corporation Charles Fantle owned 100 shares of its stock and Sam Fantle 335 shares, as indicated by the foregoing certificate stubs. Neither of the Fantles had any of their stock certificates, having surrendered the same some time after the insolvency of the corporation to P. F. Sherman, the then president, at a time when some effort was being made to reorganize the corporation (which efforts were entirely unsuccessful) and the stock certificates never having been returned to them. The stock certificate stubs in question had a space provided for showing with reference to any particular certificate issued, from what prior certificate the stock thereby represented had been transferred. With reference to certificate No. 289 for 100 shares issued to Charles Fantle and two of the certificates aggregating 110 shares issued to Sam Fantle (Nos. 290 and 298), nothing was filled in upon the certificate stubs to show from what prior owner or what prior certificate said stock was transferred, and Mr. Maytag said that he would assume from that fact that the 100 shares of Charles Fantle's stock and 110 shares of Sam Fantle's stock were an original issue directly from the corporation to the stockholder. The Fantles at all times denied purchasing any stock whatever from the corporation itself; claimed that they purchased

all stock acquired by them from one G. M. Root, who was an original incorporator and secretary of the corporation; and denied any knowledge that the stock purchased by them had not been fully paid for. At the time of the original trial Charles Fantle, called by the plaintiff as an adverse witness, testified concerning his stock ownership and purchase as follows: "I have resided in Sioux Falls about twenty-five years; I bought 100 shares of stock of the South Dakota Central Railway Company through Mr. Root; I do not know where the certificate is; I imagine Mr. Sherman has it; I am still the owner of it; I bought the certificate from George Root; I did not know who he was selling it for; I imagined he was selling some of his personal stock; I was never at a stockholder meeting and was never an officer of the Company. I never had any shares of stock belong to me except the certificate for one hundred shares I have testified about. The only certificate I bought was the one hundred shares certificate. That certificate was not issued directly from the company to me. That certificate was certified to or belonged to George Root. Although I bought it from him it may be issued direct from the Company, but I did not buy it from the Company. I bought it from Mr. Root. I did not know that certificate No. 289 was issued directly to me from the Company. I did not buy it that way."

Sam Fantle, likewise called, testified:

"I have lived at Sioux Falls, South Dakota, about twenty years; I am in business with my brother Charles Fantle in a department store corporation; I was a stockholder in the South Dakota Central Railway Company and held 335 shares of stock; as near as I can remember, I bought my first stock about two years after the road was first started; I have not the stock certificates in my possession; Mr. P. F. Sherman is supposed to have them; I bought the stock at different times and in different blocks; I was never an officer in the Company; I did not vote my stock at any time at a stockholder's meeting; I bought every dollars worth of stock that I have of George Root; he never represented to me that he was selling stock in the South Dakota Central Railway Company; he always came with a hard luck story of his own stock and that he had some one else's stock that he could get cheap and that he could offer me for less than par; I never bought a dollars worth of stock of Mr. P. F. Sherman.

"I did not ever buy any stock in the South Dakota Central Railway Company from the Railway Company itself. I bought all my stock from George Root. I paid $80.00 per share for the first, $75.00 for the second and I paid either $50.00 or $60.00 for the last I bought. I never knew but what the stock was fully paid for. I bought it on the assumption that it was fully paid."

When further testimony was taken in the circuit court after the remand by this court (54 S. D. 122, 222 N. W. 675), Charles Fantle had meantime died. Sam Fantle was again called, however, and testified with reference to his acquisition of stock in the corporation as follows:

"My name is Sam Fantle. I am one of the defendants in this case. I am still in the department store business at Sioux Falls where I have lived about thirty-four years. I had certificates covering shares of stock in the South Dakota Central Railroad Company. I did not know at the time I bought any of the stock that the South Dakota Central Railroad Company had not been paid in full when the stock was issued. To my knowledge, at the times I purchased the stock, there was no stock exchange or board of trade in operation in Sioux Falls and at the times I bought my South Dakota Central stock, that stock, so far as I knew, was not dealt in on any exchange or board. Outside of the stock I bought myself, I don't know how the sales were handled. I purchased all of my stock from Mr. Root. I never bought any from the Company itself, and was never inside the Company's office. I knew nothing about any other stock. The first stock I got, five shares, I paid eighty dollars a share for it. The next stock I bought, one certificate for ten shares, one certificate for one hundred shares and one certificate for ten shares, I bought on March 10, 1908, April 25, 1908, and May 7, 1908. I paid seventy-five dollars a share for the ten shares and one hundred shares, and I am not so positive about the third certificate of ten shares. The one hundred and ten shares which I received by transfer from G. M. Root on March 31, 1910, and the one hundred shares from P. F. Sherman on March 18, 1911, I paid fifty dollars a share. * * *

"I purchased all my stock from G. M. Root. I paid him for the stock. I had no transactions whatever with the Company. I am a brother of Charles Fantle who is now dead. We were very close, and most every transaction we dealt in together on a fifty-

fifty basis on every deal we went into. We were partners in Sioux Falls and shared an office. I was familier with the investments and the properties of Charles Fantle. I was present when George Root made a sale of the South Dakota Railroad Company stock to my brother. That was back in 1908. I can not remember the exact date. He paid the price of the stock to George Root and he paid seventy-five dollars a share. I was present when the deal was made. On all the transactions my brother and I had for South Dakota Central stock Mr. Root told us whose stock was being sold. In each instance he told us that the stock belonged to him, with one exception, and he said that belonged to a man in Chicago. We had no business transactions relating to the company itself with any one except Mr. Root. We had known Mr. Root for a long time. We did not know anything about how the stock which we had obtained from Mr. Root had been issued and we did not know what had been paid for it to the company in the first place.

"We had no talk with Mr. Root about the company. He came to us to sell us some stock and we bought it. I knew of the Company. I knew the South Dakota Railroad Company was progressing at that time. I think I had three hundred thirty-five shares of stock. I got the first five shares from Mr. Root and thought it was his stock. That is what he claimed. * * *

"I did not buy any shares of stock in the South Dakota Central Railway Company from the company itself. * * *

"I do not have any checks or stubs or writing evidencing the payments I made for any of the shares of stock. We had a fire in 1918 and everything, including my own check book, was destroyed. I paid for this stock by check."

And in response to the direct question: "Is it not a fact, Mr. Fantle, that under date of April 25, 1908, you bought certificate two hundred and ninety—issued direct to you by the South Dakota Central Railroad Co. for one hundred shares and for which you paid twenty-five dollars in cash per share and took a discount by way of credit, seventy-five hundred dollars, which was charged to construction account of the company, the railroad company?" Mr. Fanlte replied: "Absolutely not."

Sam Fantle testified also at this time (as had been, in substance, stated by Charles Fantle at the original hearing) that Mr. Root, the secretary of the corporation, came to the Fantle brothers

at one time stating that he had an opportunity to purchase 200 shares of stock in the corporation at $25 per share, which he desired to do but did not have the money to pay for them. He wished the Fantles to advance him the money, stating that he would put up the stock as collateral. The Fantles signed a note at the bank with Mr. Root for the necessary amount ($5,000), and he attached as collateral two stock certificates for 100 shares each. After paying interest on the note for some little time, Mr. Root defaulted and the Fantles were compelled to pay the note, and the two stock certificates thereto attached were surrendered to them, whereby they had an investment of $25 per share in said certificates. The Fantles took no steps, however, to have such certificates transferred into their names or to enforce the pledge and, so far as the present proceeding is concerned, it is conceded that those two 100-share certificates are not in any manner involved, nor are the Fantles claimed to be the owners thereof or liable in any manner thereon. At the taking of the further testimony plaintiff again called as its witness P. F. Sherman, who had really been the founder and organizer of the South Dakota Central Railroad. It is quite apparent that Mr. Sherman knew more about the affairs of the corporation than any one else. In testifying as to what certain of the incorporators paid for some stock issued to them, he said: "I know because they paid it to me. * * * They paid me the money. I was president, treasurer, and everything else." Mr. Sherman testified fully and without contradiction with reference to the stock issued by the corporation. He said that there were originally ten incorporators, himself, his brother, F. L. Maytag, George M. Root (who became secretary of the corporation and from whom the Fantles say they purchased all their stock), I. L. Bratager, Joe Kirby, A. B. Funk, G. W. McArthur, B. H. Lien, and J. E. Colton. Each of these incorporators agreed to put in $10,000 in cash and to take stock of the corporation therefor at the rate of eight to one. In other words, for his $10,000 cash payment each incorporator was to receive 800 shares of stock (purporting to be fully paid) of the par value of $100. Mr. Sherman testified that this was done, excepting that B. H. Lien dropped out of the arrangement and his interest was taken over by Mr. Maytag so that Mr. Maytag paid in $20,000 and received 1,600 shares of stock, and the other incorporators, Lien excepted, paid

in $10,000 each, and received 800 shares of stock each. Mr. Sherman further testified that subsequently two other individuals (R. F. Pettigrew of Sioux Falls and D. M. Perry of Minneapolis) were taken in on the same basis as the original incorporators, each paying in $10,000 and receiving 800 shares of stock of the par value of $100 per share purporting to be fully paid. He further testified that the corporation bought a grading outfit and paid for it by issuing stock on the basis of eight to one. According to Mr. Sherman's testimony, the stock issued to the original incorporators, to Mr. Pettigrew, and to Mr. Perry, and in payment for the grading machinery, constituted all of the stock which the corporation issued as purporting to be fully paid although it had received only $12.50 per share therefor. Mr. Sherman further testified that subsequently the corporation decided to issue some more stock, and after some discussion it was decided that the corporation should issue its stock (of $100 par value and purporting to be fully paid) for $25 per share. It was further agreed that the then stockholders of the corporation (that is, those who had paid $12.50 per share for their stock) should each have the privilege of taking his proportionate share of the new stock to be issued at $25 if he desired so to do, and Mr. Sherman says with reference to the stock to be issued at $25 per share that each existent stockholder "had a certain number of days to take it, and if he did not take it it could be offered to the public. *They all took it and none of it was ever offered to the public.*" Mr. Sherman further testified that Mr. Root, the secretary, never had any authority to sell stock in behalf of the corporation and that any stock purchased from Mr. Root would be his own and that he might have sold his own stock and had it issued in any way desired. Plaintiff also offered in evidence what purported to be a journal of the corporation which showed under date of April 25, 1908 (being the date of certificate No. 289 for 100 shares to Charles Fantle and certificate No. 290 for 100 shares to Sam Fantle), an entry of credit to capital stock $20,000 debit to construction account for discount on 20 shares stock $15,000, debit Charles Fantle $2,500 and debit Sam Fantle $2,500; likewise, an entry in the same book under date of May 7, 1908 (the date of certificate No. 298 for 10 shares of stock to Sam Fantle), showing credit to capital stock $1,000, debit to construction account for discount on 10 shares

$750, debit to Sam Fantle $250. The foregoing entries were on pages 441 and 446 of the journal in question and constitute Exhibits 61 and 62. Objection was made to the introduction thereof, and the court reserved ruling on such objection, and it is hard to determine from the record whether or not the entries were ever received in evidence. The sufficiency of the authentication thereof is extremely doubtful in any event. There was also identified by Mr. Sherman and offered and received in evidence portions of an instrument known in the record as Exhibit 28, being a stock record book kept by the company. Mr. Sherman testified that the book was in the handwriting of one Davis, the company's auditor, and kept under his (Sherman's) supervision. The book itself is not in the record, and what its contents may have been is shown in most unsatisfactory fashion by the reading of portions of the book into the record. As nearly as we can arrive at the situation, however, page 81 of the book purports to show certificate No. 289 to Charles Fantle on April 25, 1908, as an original issue, and certificate No. 290 on the same date to Sam Fantle likewise an original issue, as also certificate No. 298 for 10 shares to Sam Fantle on May 7, 1908. On the other hand, another portion of the same book likewise offered in evidence (page 149) shows that all the certificates issued to Sam Fantle in either 1907 or 1908 were the re-issues of stock as distinguished from an orignal issue of stock. Plaintiff also introduced the testimony of one Welte, who said that he was attorney for the plaintiff in the hereinbefore mentioned case of Shugart v. Maytag et al, pending in the district court of Jasper county, Iowa; that he had become somewhat doubtful as to Maytag's financial responsibility and wanted to find some other stockholders of the South Dakota Central Railroad Company of unquestioned financial responsibility whom he could join as defendants; that he went to Sioux Falls and made inquiries concerning the Fantles and learned that they were financially responsible, and also discovered that Sam Fantle was then at a summer resort at Lake Okoboji, Iowa; that he (Welte), accompanied by a process server, thereupon went immediately (in July, 1916) to Lake Okoboji and went to a summer resort hotel there known as "The Inn"; that he was there altogether perhaps four or five minutes; that he made inquiry for Mr. Fantle, and some one about the place pointed out an individual standing near the porch as being Mr.

Fantle; that he did not discuss with Mr. Fantle what stock certificates he held, and that Mr. Fantle did not tell him when he bought his stock or from whom he bought, or any circumstances connected with his acquisition thereof, except that he (Welte) asked Mr. Fantle if he owned stock in the South Dakota Central Railroad, and Mr. Fantle said that he did, and in reply to an inquiry as to how much, Mr. Fantle said he did not know exactly but between 300 and 400 shares, and in reply to an inquiry as to what he paid for it, Mr. Fantle said 25 cents on the dollar. With reference to this matter, Sam Fantle testified that Welte, whom he did not previously know, came up to him at the lake and inquired if he was a stockholder in the South Dakota Central Railroad. Fantle said that he was, and Welte inquired how much stock he owned, and Fantle said, "I told him approximately what I thought I had." He states that he had no talk with Welte concerning the price that he paid for the stock and that papers were then immediately served upon him by one McCord, who was with Welte, whereby he became a defendant in the Iowa case of Shugart v. Maytag.

The foregoing is a resume of all the testimony in the record concerning the acquisition and ownership of stock in the South Dakota Central Railroad by the Fantles, and it is upon that testimony that we must determine the validity (so far as concerns the Fantles) of the finding of the trial court, which, for convenience, we here repeat as follows: "The Court finds that the Finding of Fact heretofore duly filed and entered were sustained by the evidence, and further finds that the said defendants, W. L. Baker, Charles Fantle, Sam Fantle, and A. W. Hyde, did not purchase their said stock in the open market, but purchased their respective shares of stock, and the stock so held by them respectively, as set forth in the Findings of Fact hereinbefore filed and entered, and with knowledge and under circumstances and conditions affirming knowledge in them, and each of them, of the fact that such shares of stock were not fully paid for to the South Dakota Central Railway Co., and that said Railway Company had not been paid nor received therefor, at the time of the sale or delivery thereof, or at all, in money or value, in excess of Twenty-five Dollars ($25.00), per share."

We do not believe that the evidence is sufficient to establish that the Fantles had any notice (actual or constructive) of, or

were in any manner put upon inquiry with reference to, any fraud that was accomplished by the issuance of paid-up stock of the South Dakota Central Railroad for a lesser consideration than the par value thereof.

There is not a syllable of direct testimony in this record that they had any such knowledge or any reason for suspicion. The only possible argument for any such knowledge of fraud or suspicious circumstances on the part of the Fantles is the claim that they bought their first stock directly from the company and paid the company only $25 per share for fully paid-up stock, whereby they would of course have actual knowledge as to that particular stock and might thereby be put upon inquiry when they subsequently purchased stock from others as to whether or not such stock had been issued under the same circumstances as their own original stock, that is, for 25 cents on the dollar. The difficulty with this argument is that there is no sufficient proof to support it. There is no direct testimony by any person that the Fantles ever bought any stock from the corporation. On this point it is perhaps worthy of notice that in the Iowa case of Shugart v. Maytag, where Sam Fantle was also a defendant and the corporate records in evidence, the Supreme Court (though holding Fantle liable because of a view of our statute which, as hereinbefore pointed out, we believe to be erroneous) said: "None of the stock held by Fantle was purchased from the corporation, although a few shares were issued to him direct thereby." Assuming in favor of the plaintiff all questions as to the authentication and admissibility of the corporate records, the most that can be said is that a portion of said records indicates that Charles Fantle bought 100 shares of stock of the corporation and paid the corporation $2,500 therefor, and that Sam Fantle bought 110 shares of stock from the corporation and paid the corporation $2,750 therefor. It is too elementary to require citation of authority that such representation by the records of the corporation is not, under the circumstances of this case, in any manner binding upon the Fantles. They did not make the entry. They had no control or supervision over the books and are not chargeable with knowledge of the contents thereof. The most that can be said is that the existence of such book entry may be a circumstance tending to show that the Fantles in fact did buy their stock from the corporation and pay $25 only

for it, as the book entries appear to indicate. Like any other circumstance, however, it cannot in and of itself rise to sufficient proof of the fact in behalf of the party having the burden of proof unless it is not susceptible of explanation on any other hypothesis fairly and reasonably deducible from the evidence. See Miller v. Uvaide, etc., Co. (1909), 134 App. Div. 212, 118 N. Y. S. 885; Blid v. Chicago, etc., R. Co. (1911) 89 Neb. 689, 131 N. W. 1027; Mooney v. Mooney (1912) 244 Mo. 372, 148 S. W. 896; Anderson v. Chicago, R. I. & P. R. Co. (1926) 243 Ill. App. 337; Emory University v. Bliss (1926) 35 Ga. App. 752, 134 S. E. 637; Tisthammer v. Union Pac. R. Co. (1930) 41 Wyo. 382, 286 P. 377; Florida East Coast R. Co. v. Acheson (1931) 102 Fla. 15, 135 So. 551, 137 So. 695, 140 So. 467; Gregory v. Sorenson (1932) 214 Iowa 1374, 242 N. W. 91; Sullivan v. Mountain States Power Co. (1932) 139 Or. 282, 9 P (2d) 1038. That is far from being the case here. In the first place, the corporate records are not internally consistent. At one point they show the 110 shares issued to Sam Fantle as an original issue and elsewhere they show it as a reissue. In the second place, so far as the records appear to indicate that the Fantles bought any stock from the corporation, they are directly impeached by the testimony of plaintiff's own witness Sherman, the very witness whose testimony gives the corporate records whatever authenticity they may have. There is no word of testimony in this record showing, or tending to show, that the Fantles ever had any dealings whatsoever concerning the stock of the corporation with any person other than G. M. Root. Mr. Sherman specifically testifies that no stock was ever offered by the corporation to the general public, but that, so far as the corporation is concerned, all of its stock (some at $12.50 and some at $25) was taken by the original incorporators, the two men whom they subsequently admitted on the same basis, and the concern which took stock in payment for a grading outfit. He further testifies that Mr. Root had no authority to sell stock in behalf of the corporation, but that in selling his own stock Root might have handled the matter on the records of the corporation as he pleased. It is entirely apparent from the record in this case that the nine original incorporators (the interest of Lien having been taken over by Maytag) and the two men subsequently admitted took or subscribed for all the stock of the corporation (excepting only that

issued in payment for the grading outfit) paying $12.50 per share for some and $25 per share for the remainder, and subsequently themselves marketed large quantities of their own stock for the best price they could get. The strongest inference from the record in this case is that Root, who had subscribed for his proportion of the stock which the incorporators issued to themselves at $25 per share but apparently had not paid for all of it or received certificates for all of it, sold a portion thereof to the Fantles and, instead of having certificates issued to himself and then transferring the same to the Fantles, had the certificates issued direct to the Fantles, and for some reason of his own (perhaps merely convenience in the saving of book work, perhaps some other reason entirely) caused the transaction to be entered on the books of the company as a direct purchase by the Fantles from the corporation. But there is an utter lack of testimony showing or tending to show that the Fantles had any knowledge whatever of such conduct by Root. So far as concerns the testimony of the witness Welte, it relates exclusively to Sam Fantle. A statement by Fantle to an utter stranger to whom he owed no conceivable duty of disclosure that he paid $25 per share for his stock does not prove or tend to prove, that he bought the stock from the corporation or that he had any knowledge as to what the corporation itself received for the stock which he ultimately bought.

We are convinced that the record in this case fails to prove that the Fantles ever had any dealings with the corporation or bought any stock from the corporation, or had any knowledge or notice or reason to suspect that the stock which they acquired and which purported to be fully paid had been fictitiously issued by the corporation.

The only remaining question, then, is as to the liability of the Fantles, regardless of notice, on the 100 shares issued to Charles Fantle and the 110 shares to Sam Fantle, which, according to a portion of the corporate records, were an original stock issue by the corporation to the Fantles. Conceding that the corporate records so show and disregarding the point that the record in another place indicates otherwise, at least as to the Sam Fantle stock, we do not believe that the mere fact that this may have been an original stock issue, so far as indicated by the books of the corporation, is sufficient to render the Fantles liable. As we have

previously pointed out, this type of action sounds in tort and its essence is fraud. If the Fantles did not have notice of or participate in the fraud, they should not be liable regardless of what the corporate records may indicate. Let it be assumed (and there is no evidence in this record to prove otherwise) that the Fantles dealt with Root and supposed they were buying Root's stock. Let it be assumed that Root, who had subscribed for the stock but not yet paid for and taken the same, caused the certificates to be issued to the Fantles in the first instance, and caused the transaction to be shown on the books of the corporation as though the Fantles had dealt directly with the corporation. There is no proof that they did in fact so deal, and there is no evidence that the Fantles had any knowledge of Root's conduct. Root was secretary of the corporation and the fraud was still between Root and the corporation. Root was the very man to whom a stock certificate, when sold, would be presented for transfer, cancellation, and reissue. We do not believe that the Fantles are liable in this case merely because when Root wanted to sell them some of his stock and they agreed to buy it, they failed to insist that Root exhibit his stock certificate to them so that they could hand it back to him as secretary of the corporation and ask him to have it canceled and a new certificate issued to them.

Our statute, as we have previously pointed out, was not intended to change the common law. The gist of this action is fraud. The fraud was committed when the corporation, receiving only 25 cents on the dollar, issued its stock as fully paid up. Upon this record, it cannot be said that the Fantles participated in that fraud, had knowledge thereof, or should be chargeable therewith. As this court has previously had occasion to state: "Fraud, like any other fact in a civil case, may be proven by a preponderance of the evidence, but, unless the evidence is clear and convincing, it is not sufficient to overcome the presumption of honesty, without which there is no preponderance of evidence." Guaranty State Bank v. Potter (1926) 49 S. D. 619, 208 N. W. 170, 172. There is in this case no direct testimony showing fraud or knowledge of fraud on the part of the Fantles. Every circumstance offered by plaintiff as tending to prove fraud is equally and indeed more satisfactorily explainable in the light of the testimony of plaintiff's own witnesses on other hypotheses fairly and reasonably deducible

from the evidence. We are compelled to the view that 'ability is not established.

This litigation has been in progress for some sixteen years. It has been twice before the circuit court, where the matter has been thoroughly canvassed, and there is no reason to believe that another trial of the issues would change the fact showing.

The finding upon which the liability of the Fantles is predicated being insufficiently supported by the evidence, the judgment and order appealed from, so far as they are concerned, are reversed, and the cause remanded, with directions to enter conclusions and judgment upon the remaining findings in favor of the Fantles and against the plaintiff dismissing the action as to them.

WARREN and RUDOLPH, JJ., concur.

POLLEY, J., and ROBERTS, P. J., dissent.

POLLEY, J. (dissenting). I am not able to agree with the majority of the court on the questions decided in this case. In the first place, I think the evidence is amply sufficient to support the finding of the court that the defendants had knowledge when they bought the stock that it had not been fully paid for. There was evidence both oral and written tending to show that they did have such knowledge. The evidence to the contrary consisted of the oral evidence by the defendants themselves, and the court had a perfect right to, and apparently did, disbelieve them. In any event, this is a matter solely within the province of the trial court and with which this court has no right to interfere.

In the second place, I am satisfied that we have put the wrong interpretation on section 8779, Rev. Code 1919. This section, so far as applicable, reads as follows: "Each stockholder of a corporation is individually and personally liable for the debts of the corporation to the extent of the amount that is unpaid upon the stock held by him." This statute is too plain to admit of any construction. Its purpose was to prevent the issuance and distribution of "watered" or "fictitious" stock. It was intended to be of value to creditors who had extended credit to the corporation upon the belief that outstanding stock had been paid for and that the money so paid was in the treasury of the corporation and constituted a fund for the payment of the corporation's debts. It is said in the opinion of the majority that: "There is no direct testimony

by any person that the Fantles ever bought any stock from the corporation." They bought the stock from the secretary of the corporation, and the records of the corporation kept by the secretary show that it was new or original stock that had never been issued to anyone before. They may have "had no control or supervision over the books," but they had access to them and should be charged with knowledge of what they contained. They should not be allowed to escape liability because they did not know what they could have learned by making inquiry.

As construed by the court in this opinion, the statute above quoted now reads as follows: "Each stockholder of a corporation is individually and personally liable for the debts of the corporation to the extent of the amount that is unpaid upon the stock held by him; except where he purchased his stock in the open market and without notice that the stock had not been paid for in full." The court has no right to mutilate this statute in any such manner. In Standard Oil Co. v. James McNenny, 62 S. D. 277, 252 N. W. 841, just recently handed down, referring to a certain statute, we said: "It would be unreasonable, we believe to read into the said statute a legislative intent which would prevent this judgment from becoming final until one year after the death of A. G. Powers." This rule is equally applicable to the statute involved in this case and should be given the same effect.

Section 8775, Rev. Code 1919, reads as follows: "All corporations for profit must issue certificates of stock when fully paid up, signed by the president and secretary, and may provide in their by-laws for issuing certificates prior to full payment, under such restrictions and for such purposes as their by-laws may provide. Preferred stock may also be issued, as may be provided in the articles of incorporation or in the by-laws, and certificates of preferred stock shall be issued as above provided. When property is taken by the corporation in consideration for the capital stock of the corporation, the judgment of the board of directors, made in good faith and entered in the minutes of the corporation, shall be conclusive as to the value of such property. Whenever the capital stock of any corporation is divided into shares and certificates therefor are issued, such shares of stock are personal property and may be transferred by indorsement by the signature of the owner, or his attorney or legal representative, and delivery

of the certificate; but such transfer is not valid, except between the parties thereto, until the same is so entered upon the books of the corporation as to show the names of the parties, by and to whom transferred, the number or designation of the shares, and the date of the transfer."

Where parties purchase stock in the "open market," they purchase the certificates representing the stock from the owner thereof, then present the stock certificate to the secretary of the corporation to have it transferred to him on the books of the corporation. This is done by canceling the old certificate, issuing the purchaser a new certificate, and making an entry to that effect on the stock book of the corporation. No such transaction took place in this case. Defendants purchased their stock directly from the secretary of the corporation. He issued the certificates and made an entry in his stock book to the effect that it was a new issue. This, in the absence of fraud, which is not charged in this case, is the best possible evidence of the transaction that took place.

ROBERTS, P. J., concurs in the dissent.